**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                        :

ANGELA FIORENTINO,           :

                      :    Civil Action No. 15-02065 (FLW)(LHG)

            Plaintiff,   :

                      :    **OPINION**

    v.                  :

                      :

BRICKLAYERS & ALLIED     :

CRAFTWORKERS LOCAL 4 PENSION  :

PLAN AND THE BOARD OF     :

TRUSTEES OF THE BRICKLAYERS &  :

ALLIED CRAFTWORKERS LOCAL 4  :

PENSION PLAN,            :

                      :

            Defendants.  :

_____ :

**Hon. Freda L. Wolfson, U.S.D.J.:**

Presently before the Court are the parties' cross-motions for summary judgment on Plaintiff Angela Fiorentino's claims of entitlement to pension benefits under 29 U.S.C. § 1132(a)(1)(B) and for breach of fiduciary duty by an ERISA plan administrator pursuant to 29 U.S.C. § 1104(a)(1). Defendants, the Bricklayers & Allied Craftworkers ("BAC") Local 4 Pension Plan (the "Pension Plan") and the Board of Trustees of the Bricklayers & Allied Craftworkers Local 4 Pension Plan (the "Trustees"), argue i) that the application of § 302 of the Taft Hartley Act, codified at 29 U.S.C. §§ 186(a)-(c), renders Plaintiff legally incapable of having been a plan participant and would render illegal any payment of pension benefits to Plaintiff by Defendants, and ii) in the alternative, that the statute of limitations for Plaintiff's ERISA claims has run. Plaintiff cross moves for summary judgment on the merits based on her interpretation of the benefits eligibility criteria set forth in the Pension Plan's Plan Document.

1

For the reasons that follow, the Court finds that Plaintiff's claims are time barred by the applicable statutes of limitations, and therefore Defendants' motion is GRANTED.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Establishment of the Local 4 Pension Plan

Defendant Bricklayers & Allied Craftworkers Local 4 Pension Plan was established on April 14, 1959, through the execution of an Agreement and Declaration of Trust (the "Trust Agreement") by the Bergen County Conference of Bricklayers, Masons and Plasterers International Union ("the Union") and the Master Builders Association of Bergen County and Home Builders Association of Northern New Jersey (collectively, "the Collective Bargaining Employers"). [Defendants' Statement of Undisputed Material Fact ("Defendants'") ¶¶ 1-2]. The Trust Agreement itself was executed pursuant to a preexisting collective bargaining agreement between the Union and the Collective Bargaining Employers, effective May 1, 1959, which required that payments be made by the collective bargaining employers for the purpose of providing a pension program. *Id.*

The Trust Agreement establishes the Pension Plan first, by constituting the Defendant Trustees [May 1, 1959 Agreement and Declaration of Trust, Art. II(2)], and then empowering the Trustees to establish and maintain a pension plan for the benefit of designated employees. *Id.* at Art. II(4)(2). The Trustees duly exercised their authority under the Trust Agreement to establish the Local 4 Pension Plan, governed by the Plan Document. The Pension Plan is a multiemployer plan as defined by Section 3(37) of ERISA. [Defendants' ¶ 4]. The parties agree that the terms of the Pension Plan, including employee eligibility criteria in order to be entitled to benefits, are set

forth in the BAC Local No. 4 Pension Plan Document, effective January 1, 2003 (the "Plan Document").[1] [Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's") ¶¶ 14-20].

## B. Establishment of the Health Fund

Separately, in or around 1995, all of the local BAC union health funds in the State of New Jersey were consolidated into an entity now known as the New Jersey BAC Statewide Health Fund (the "Health Fund"). Mercante Tr. 94:11-21. The Health Fund was established pursuant to an agreement not provided to the Court, which agreement, it is undisputed among the parties, is separate and distinct from the Trust Agreement establishing the Pension Plan and the Trustees. The Health Fund is not a signatory to the Trust Agreement of the Pension Plan.

Gary Mercante was hired to administer the Health Fund in June of 1996. Between June 1996 and June 8, 2006[2], Mr. Mercante performed administrative functions for the Health Fund. Mercante Tr. 104; Mercante Certification ¶¶ 7-9.

## C. Plaintiff's Employment by the Health Fund

In 1997, Gerald DellaSalla was the administrative manager of the Pension Fund. [Plaintiff's ¶ 25]. At some point in 1997, Mr. DellaSalla advised Plaintiff that there was a job opening at the Health Fund. *Id.* At the time he informed her of the position, Mr. DellaSalla

---

[1] Although the parties in their motions make some arguments interpreting the eligibility criteria set forth in the Plan Document and the related Summary Plan Description, it is clear that, as a matter of law, the first dispute before the Court is whether the criteria set forth in these documents apply to a claimant in Plaintiff's position. Accordingly, the parties "agree" that the Plan Document sets forth eligibility criteria, not that these criteria should be applied to Plaintiff.
[2] Plaintiff contends that Mr. Mercante assumed responsibility for administering the Annuity Fund and the International Pension Fund in or around 2000, [Plaintiff's ¶ 27], but for the purposes of this motion it is only important for the Court to note that it is undisputed that by June 8, 2006 at the latest, Mr. Mercante had responsibilities as fund administrator for the Pension Plan.

indicated to Plaintiff that if she were to obtain the position, she would be allowed to participate in the Pension Plan, the Bricklayers & Allied Craftworkers Local 4 Annuity Fund ("Annuity Fund"), and the Bricklayers & Allied Craftworkers International Pension Fund ("International Fund"). [Plaintiff's ¶ 28].

In or around 1997, Plaintiff applied, and was interviewed by Mr. Mercadante for an open position at the Health Fund. [Plaintiff's ¶ 29]. It is undisputed that, as a result of the interview, Plaintiff was hired by the Health Fund, in or around 1997, to act as a clerical office worker. *Id.* at ¶ 31. What else transpired during Plaintiff's initial job interview between Mr. Mercadante and the Plaintiff is a matter of dispute between the parties and thus cannot be relied upon by the Court in considering the present motions. Plaintiff contends that Mr. Mercadante confirmed Mr. DellaSalla's representation that, as an employee of the Health Fund, she would participate in the Pension Plan, the Annuity Fund, and the International Fund. *Id.* at ¶ 30. Mr. Mercadante contends that he informed Plaintiff at the interview that the base compensation package included participation in the Annuity Fund only, but that he and Plaintiff then negotiated to have Plaintiff participate in both the Annuity Fund and the International Fund, but not the Pension Plan. Mercadante Tr. 155-57.

In or around 1998, Plaintiff had a "first year review" meeting with Mr. Mercadante at which Mr. Mercadante informed Plaintiff that she would not be able to participate in the Pension Plan. [Plaintiff's ¶ 32].

At that 1998 meeting, based on her recollection of the promises made to her by Mr. DellaSalla and Mr. Mercadante at the time of her hiring in 1997, Plaintiff believed that she was entitled to participation in all three benefit funds, and, accordingly, complained to Mr. Mercadante that she was entitled to participate in the Pension Plan. *Id.* at ¶ 33. What exactly Mr.

Mercadante said in response is disputed, but the parties agree that Mr. Mercadante informed Plaintiff that she would not be able to participate in the Pension Plan. *Id.* at ¶ 33.

There are numerous factual disputes concerning Plaintiff's participation in the Annuity Fund and the International Fund that are not germane to the present motions and therefore will only be briefly noted as follows. Plaintiff contends that at the 1998 "first year review" meeting Mr. Mercadante also told her she would not be able to participate in the Annuity Fund and the International Fund and that these benefits were only secured later after Plaintiff's appeals for assistance to Mr. DellaSalla and Linda Meudt, the office manager of the Health Fund. Fiorentino Tr. 16:1-12. Defendants contend that Mr. Mercadante negotiated with Plaintiff at the initial 1997 job interview meeting for Plaintiff's participation in both of these benefit funds. Mercadante Tr. 155-56. For the purpose of these motions, the Court need only observe that under either Plaintiff's or Defendants' accounts, Plaintiff was enrolled as a participant in the Annuity Fund and the International Fund and contributions were being made by the Health Fund to the Annuity Fund and the International Fund on her behalf at the latest by sometime at or around her second annual review in 1999. [Plaintiff's ¶ 43-44].

Plaintiff was employed by the Health Fund from sometime in 1997 until her retirement in June 2014. During that time, it is undisputed that Plaintiff was a "non-bargaining" or non-union employee. *Id.* at ¶ 2. During the period of her employment, Plaintiff did not pay dues to a union and was never issued a union book. [Defendants' ¶ 10].

During her employment after 1999, Plaintiff received annual statements confirming the Health Fund's contributions to the Annuity Fund and the International Fund on her behalf. [Defendants' ¶ 19]. Plaintiff did not receive statements concerning the Pension Plan. *Id.*

**D. Remittance Forms Submitted for Other Health Fund Employees**

Currently, the Health Fund has approximately six employees. [Plaintiff's ¶ 12 and Defendants' Objections to ¶ 12]. It appears that during the period of Plaintiff's employment there were approximately the same number of employees of the Health Fund at a given time, varying slightly based on individual hiring and departures. The Health Fund contributed to the Pension Plan on behalf of three of these employees: fund administrator Gary Mercadante, office manager Linda Meudt, and office manager in-training Oretta St. Ives.[3] [Plaintiff's ¶¶ 46-47]. In addition to Plaintiff, the Health Fund did not contribute to the Pension Plan on behalf of at least one other employee, Maria Delores Lopez, who was hired at some point in 2010. [Plaintiff's ¶ 61].

The Health Fund remitted its contributions to the Pension Plan on behalf of Mr. Mercadante, Ms. Meudt, and Ms. St. Ives using the same employer remittance report form that contractors use when making contributions on behalf of employees covered by the contractors' collective bargaining agreements with the Union. [Plaintiff's ¶ 73]. The employer remittance report in use from at least 1998 through mid-2006 included the following language:

> By forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said Funds. Fund is filing all of its data with the IRS.

[Plaintiff's ¶ 75]. From July 2011 onward, the employer remittance reports were revised and included the following language:

---

[3] The parties agree that although Ms. St. Ives was hired to train for and then take over the role of Ms. Meudt as office manager, Ms. St. Ives left the Health Fund prior to Ms. Meudt's retirement and was never elevated to the title of office manager. Although the Health Fund made contributions on behalf of Ms. Meudt and Ms. St. Ives to the Pension Plan, neither was enrolled as a participant in the International Fund in which Plaintiff participated. The Health Fund thus did not make any contributions on behalf of Ms. Meudt or Ms. St. Ives to the International Fund. [Plaintiff's ¶¶ 60, 63, 64].

> I certify that the information contained in this report is true and correct and that the below listed employees represent all of the employees employed under the terms of an Agreement between the employer and BAC Local 4 and as provided for in the applicable Fringe Benefit Trust Agreements.

The Health Fund submitted remittance reports including the quoted language for each of the three employees during the periods of their employment: for Mr. Mercadante for some period between 1996 until June 2006; for Ms. Meudt for some period between 1997 and 2013; and for Ms. Ives for some period between 2007 and 2010. [Plaintiff's ¶¶ 47-48]. It is undisputed that no remittance forms were ever submitted to the Pension Plan on behalf of Plaintiff and that no contributions were ever made by the Health Fund to the Pension Plan on behalf of Plaintiff. [Defendants' ¶ 16].

**E. Mr. Mercadante Becomes a Fiduciary of the Beneficiaries of the Pension Plan**

Under the Trust Agreement, the Trustees are responsible for administering the Pension Plan and serve as its administrator and plan sponsor, as defined in sections 3(16)(A) and 3(16)(B) of ERISA, 29 USC 1002(16)(A) and 1002(16)(B). [Plaintiff's ¶ 5]. The Trustees, however, are permitted under the Plan Document to delegate their responsibility for the day-to-day administration of the Plan. Plan Document, Art. XI(1).

On June 8, 2006, the Trustees appointed Mr. Mercadante, who was already the administrator of the Health Fund, to be the Fund Administrator of the Pension Plan as well. Mercadante Tr. 104; Mercadante Certification ¶¶ 7-9. The parties agree that Mr. Mercadante was a fiduciary of the Pension Plan from June 8, 2006, at the latest.

**F. Plaintiff's Request for a Benefits Application**

In June 2014, Plaintiff retired from the Health Fund. [Plaintiff's ¶ 80]. On July 30, 2014, Plaintiff, through counsel, requested an application for benefits from the Pension Plan.

[Plaintiff's ¶ 81]. On August 18, 2014, Mr. Mercadante, on behalf of the Pension Plan, in his capacity as fund administrator, sent Plaintiff a letter which read:

> In accordance with your request, enclosed is an application form for the Local 4 Annuity Fund. Mrs. Fiorentino is not a participant of the Local 4 Pension Plan.

[Plaintiff's ¶ 82]. No application for benefits from the Pension Plan was provided to Plaintiff.

## G. Initiation of the Present Suit.

Plaintiff filed a two count complaint on March 23, 2015, naming the Pension Plan and the Trustees as defendants and alleging entitlement to benefits pursuant to 29 USC 1132(a)(1)(B) [Count I] and breach of fiduciary duty pursuant to 29 USC 1104(a)(1) [Count II]. Plaintiff and defendants filed the present cross motions for summary judgment on February 8, 2016.

In her motion, Plaintiff asserts that under the eligibility criteria set forth in the Plan Document, she is a participant in the Pension Plan able to sue under the aforementioned ERISA provisions and seeks a declaration of her entitlement to benefits on the merits. In their motion, Defendants present two alternative bases for judgment against Plaintiff. First, Defendants argue that because there is no written agreement between Plaintiff's former employer — the Health Fund — and the Defendant Pension Plan, pursuant to § 302 of the Taft Hartley Act, (i) there can be no legal trust administered by Defendants for Plaintiff's benefit, (ii) Plaintiff is not and could not have been a legal "participant" in the Pension Plan within the meaning of §§ 1132 and 1104, and, therefore, (iii) Plaintiff's claims for entitlement to benefits and breach of fiduciary duty must be denied. Second, Defendants argue, in the alternative, that even if Plaintiff were a participant in the Pension Plan within the meaning of §§ 1132 and 1104, her causes of action under those provisions would be barred by the applicable statutes of limitations.

## II. STANDARD OF REVIEW

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Brooks v. Kyler,* 204 F.3d 102, 105 n. 5 (3d Cir. 2000) (citing FED R. CIV. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir. 1999). "Put another way, it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.,* 19 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED. CIV. P. 56(e); *Anderson,* 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n. 5 (citing *Anderson,* 477 U.S. at 249).

## III. ANALYSIS

The fundamental dispute between the parties in their cross motions is whether Plaintiff is a "participant" in the Pension Plan for purposes of ERISA. This dispute is potentially dispositive for two reasons. Firstly, under the terms of the applicable statutes, in order to have standing to bring her claims for entitlement to benefits under 29 U.S.C. § 1132 and for breach of fiduciary duty under 29 U.S.C. § 1104, Plaintiff must qualify as a "participant" in the Pension Plan.[4] Secondly, Defendants contend that the denial of Plaintiff's status as a "participant" by the Pension Plan's fund administrator, Mr. Mercadante, in 2006, and, indeed, every year thereafter, started the running of the statute of limitations for both of Plaintiff's claims, which statute would have run before the filing of the Complaint in 2015.

---

[4] Although the parties have not explicitly argued the "participant" issue as a question of standing, "'federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.'" *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). "To bring a civil action under ERISA, a plaintiff must have constitutional, prudential, and statutory standing." *Leuthner v. Blue Cross & Blue Shield of Ne. Pennsylvania*, 454 F.3d 120, 125 (3d Cir. 2006). In this case, there is no jurisdictional issue of Article III, or constitutional, standing. "'[T]he irreducible constitutional minimum of standing contains three elements.' First, the plaintiff must suffer an injury-in-fact that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical. Second, 'there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' 'Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Edmonson*, 725 F.3d at 415 (alterations in original) (quoting *Lujan*, 504 U.S. at 560). The Defendant Trustees' denial of Plaintiff's participant status resulted in ineligibility for pension benefits, which, if wrongful, would give rise to an injury-in-fact; and a favorable decision by this Court would likely lead to an award of benefits under ERISA redressing the alleged injury. Moreover, the Third Circuit has held that "the language of [ERISA] § 502(a)(1) [codified at 29 U.S.C. § 1132(a)(1)] sets forth the standing requirements to bring such an action—both prudential and statutory standing." *Leuthner*, 454 F.3d at 125. As the *Leuthner* court observed that the "participant" analysis under ERISA required for statutory standing is sufficient for prudential standing also, the only standing question before this Court is a statutory one.

On the undisputed factual record before the Court, I cannot resolve as a matter of law the question of Plaintiff's statutory standing to sue as an ERISA Plan "participant." Statutory standing under ERISA, however, is non-jurisdictional, and this Court therefore proceeds to the question of whether, assuming Plaintiff's participant status, her ERISA claims are nevertheless time barred by the applicable statutes of limitations. This Court finds that Plaintiff's claims are so time barred and therefore grants Defendants' motion for summary judgment.

## A. Plaintiff's Statutory Standing as a Plan "Participant"

Plaintiff raises two ERISA claims in her Complaint: § 1132 entitlement to benefits in Count I and § 1104 breach of fiduciary duty in Count II. In relevant part, § 1132 reads:

> A civil action may be brought -- (1) *by a participant* or beneficiary -- . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C § 1132(a)(1)(B) (emphasis added).

The relevant portion of § 1104 states:

> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely *in the interest of the participants* and beneficiaries and- . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1)(D) (emphasis added). Accordingly, only a participant or a beneficiary may bring an action under either ERISA provision. Plaintiff does not contend she is a beneficiary of the Pension Plan, and therefore can only bring her claims as a Plan participant.

Under ERISA "[t]he term 'participant' [in both § 1132 and § 1104] means any employee or former employee of an employer, . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members

of such organization . . . ." 29 U.S.C. § 1002(7). "Applying this definition, the Supreme Court has held that the term covers a former employee with a colorable claim for 'vested benefits.'" *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 296 (3d Cir. 2007) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989)). *See also Firestone*, 489 U.S. at 117 ("Congress did not say that all 'claimants' could receive information about benefit plans. To say that a 'participant' is any person who claims to be one begs the question of who is a 'participant' and renders the definition set forth in § 1002(7) superfluous."); *Miller v. Rite Aid Corp.*, 334 F.3d 335, 342 (3d Cir. 2003) ("But § 1002(7) does not define a former employee who 'might have' become eligible for benefits as a participant under ERISA.").

"The question of whether a plaintiff is a 'participant,' and thereby has standing to bring [an ERISA] claim, is most often addressed after the filing of motions to dismiss or for summary judgment." *Miller v. Rite Aid*, 334 F.3d at 343. At the pleading stage, the Third Circuit has "interpreted the colorable claim requirement as a lower burden of persuasion than showing likelihood of success on the merits." *Leuthner*, 454 F.3d at 124 (citing *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 78–79 (3d Cir. 2001)). However, "[s]tanding is 'not [a] mere pleading requirement[,] but rather an indispensable part of the plaintiff's case, each element [of which] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.'" *Miller v. Rite Aid*, 334 F.3d at 343 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements ... [a]nd at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.*

In *Miller v. Rite Aid*, the district court entered judgment for defendant once it had determined, after trial, that plaintiff was not an ERISA participant and therefore had no standing to sue. On appeal, the Third Circuit vacated and remanded on the basis that the district court should have dismissed plaintiff's claim rather than entering judgment for defendant because the absence of statutory standing left the district court without jurisdiction to hear the case. Lest this Court's reliance on *Miller v. Rite Aid* create any confusion, the Third Circuit has clarified statutory standing jurisprudence since *Miller v. Rite Aid*, and it is now clear that statutory standing is a substantive rather than jurisdictional element of plaintiff's claim. "Unlike Article III standing, statutory standing is inherently non-jurisdictional, and . . . challenges to it should be brought by way of a 12(b)(6) motion, a summary judgment motion, or arguments on the merits—not by way of a 12(b)(1) motion." *Wallach v. Eaton Corp.*, No. 15-3320, 2016 WL 4791849, at *3 n.9 (3d Cir. Sept. 14, 2016). *See also Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) ("Unlike Article III standing, statutory standing is not jurisdictional. Statutory standing goes to whether Congress has accorded a particular plaintiff the right to sue under a statute, but it does not limit the power of the court to adjudicate the case.") (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* ––– U.S. ––––, 134 S.Ct. 1377, 1388 & n. 4, 188 L.Ed.2d 392 (2014)).

Accordingly, for the purposes of Plaintiff's summary judgment motion, the burden falls upon Plaintiff to *prove* her status as an ERISA participant in the Pension Plan based upon the undisputed facts; it is not enough at this stage for Plaintiff merely to claim participant status or show that her claim of status is non-frivolous. *Miller v. Rite Aid*, 334 F.3d at 343 ("The 'colorable' language . . . is not part of a generic *legal* test for meeting the definition of 'participant,' but is reflective of the minimal evidentiary production demanded of a plaintiff to

avoid summary judgment."); *id.* (citing *Firestone,* 489 U.S. at 118 ("Once [plaintiff's] purported

claim was brought to trial, it was no longer simply a question of whether [plaintiff] could make

out a non-frivolous or *'colorable* claim to vested benefits.'") (emphasis added)); *id.* (*citing*

*Lujan,* 504 U.S. at 561) ("[Plaintiff] had to prove 'by the evidence adduced at trial' that he

actually met the definition of participant. If, as the Court finds here, Plaintiff cannot meet her

burden, the issue may properly go to trial on the merits.")). Conversely, for Defendants to prevail

on their motion for summary judgment, they must demonstrate that the application of the Taft

Hartley Act prevents Plaintiff from raising a colorable claim.

## 1. Defendants' Motion Under § 302 of the Taft Hartley Act

Defendants' statutory standing argument rests entirely upon the interpretation of § 302 of

the Taft Hartley Act, codified at 28 U.S.C. §186. Section 302 provides in relevant part:

> (a) Payment or lending, etc., of money by employer or agent to employees,
> representatives, or labor organizations
>
> It shall be unlawful for any employer or association of employers . . . to pay, lend, or
> deliver, or agree to pay, lend, or deliver, any money or other thing of value—
>
>> (1) to any representative of any of his employees who are employed in an industry
>> affecting commerce; . . .
>
> (b) Request, demand, etc., for money or other thing of value
>
>> (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree
>> to receive or accept, any payment, loan, or delivery of any money or other thing of
>> value prohibited by subsection (a) of this section. **. . .**
>
> (c) Exceptions
>
> The provisions of this section shall not be applicable . . .
>
>> (5) with respect to money or other thing of value paid to a trust fund established by
>> such representative, for the sole and exclusive benefit of the employees of such
>> employer, and their families and dependents (or of such employees, families, and
>> dependents jointly with the employees of other employers making similar payments,
>> and their families and dependents): *Provided,* That

(A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance;

(B) *the detailed basis on which such payments are to be made is specified in a written agreement with the employer*, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . ., and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and

(C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities;

29 U.S.C. § 186(a)-(c) (emphasis added). In short, the statute operates in two steps. First, subsections (a) and (b) create a blanket ban on certain conduct by specified actors, namely employers may not make payments to the representatives of their employees and employee representatives may not accept payments from employers. Second, subsection (c) creates various exceptions to the blanket bans established in (a) and (b), allowing payments from employers to employee representatives in certain circumstances.

The trustees of union benefit funds, like the defendant Trustees in this case, qualify as employee representatives for the purposes of §§ 302(a) and (b). Accordingly, Defendants are barred from accepting payments from any employers who fall within the purview of the statute unless one of the exceptions of subsection (c) applies. The exception that governs employer contributions to pension benefit trusts is § 302(c)(5).

Defendants contend that although the Health Fund is constituted as a union benefit trust, in relation to Plaintiff, it operated merely as an employer. Accordingly, Defendants argue that, as

15

an "employer," the Health Fund would be barred by § 302(a) of the Taft Hartley Act from making any contributions to the Pension Plan on behalf of Plaintiff, and the Pension Plan would be barred by § 302(b) from accepting any such payments, unless the exceptions in § 302(c)(5) were found to apply.

In relevant part, subsection 302(c)(5)(B) authorizes contributions by employers to a union pension benefit trust on behalf of their employees only if there is a written agreement setting forth the detailed basis on which such contributions are to be made. 29 U.S.C. § 186(c)(5)(B). Defendants contend that there is no written agreement between the Health Fund and the Pension Plan covering Plaintiff, and, therefore, no contributions could legally have been made and no legal § 302 trust with respect to Plaintiff could have been created.

From this legal conclusion, Defendants argue that both counts of Plaintiff's Complaint must be dismissed. Defendants argue that Plaintiff's Count I claim for benefits under § 1132, must be dismissed with prejudice because, as explained in the Second Circuit's opinion in *Moglia v. Geoghegan*, "[o]nly employees and former employees of employers who are lawfully contributing to a union pension trust fund may qualify as beneficiaries of a Section 302 trust." 403 F.2d 110, 116 (2d Cir. 1968). Because there is no written agreement between the Health Fund and Pension Plan, no lawful contributions to the Pension Plan by the Health Fund on behalf of Plaintiff could have been made, and Plaintiff could not lawfully have been a participant in the Pension Plan legally entitled to benefits.

Defendants argue that Plaintiff's Count II claim for breach of fiduciary duty must also fail because the Trustees cannot have breached their fiduciary duties by failing to collect monies to which they were not legally entitled.

16

Although it is an out of circuit opinion that is not binding on this Court, the Court does not find fault with the Second Circuit's reasoning in *Moglia* that where, by action of § 302, there is no legal trust, a purported beneficiary or participant does not have an enforceable right to benefits therefrom. *See Moglia*, 403 F.2d at 116 ("Absent the written agreement, there is no valid Section 302 trust as to those employer contributions; the parties making and accepting such contributions are violating Section 302, and the intended beneficiary of the illegal employer contributions has no legal right under Section 302 to the benefits normally derived from employer contributions to the trust fund.").

The Court, however, observes that there is an antecedent issue that must be decided before the question of the legality of any trust for the benefit of Plaintiff under § 302 is even reached: that is, whether the Health Fund is in fact an "employer" within the meaning of §§ 302(a) and (c)(5) in the first instance. Stated differently, the Court must determine whether Section 302 is applicable to the Health Fund as Plaintiff's employer, before it evaluates the impact of the statute upon Plaintiff.

In her Opposition to Defendants' Motion, Plaintiff argues that as a benefit fund of the Union itself, the Health Fund is not an "employer" subject to the limitations of § 302(c)(5). Plaintiff argues that § 302 was intended by Congress to prevent the corruption of the collective bargaining process and cites a number of out of circuit opinions, chief among them *Blassie v. Kroger Co.*, 345 F.2d 58 (8th Cir. 1965), for the proposition that the term "employer" under § 302(c)(5)(B) of the Taft Hartley Act refers only to an employer subject to collective bargaining with the union establishing the benefit fund.

Neither Plaintiff nor Defendants have provided any controlling precedent from within the Third Circuit addressing this issue, and the Court's own research has uncovered none.

17

Accordingly, the question before this Court is whether the reasoning of *Blassie*, and the cases adopting its holding that followed, should be extended to the case at bar. This Court finds the *Blassie* line of cases persuasive and follows it here.

In *Blassie*, a retired former employee of a union pension benefit fund sought to claim pension benefits from the fund. The fund denied the former employee's claim for benefits and the employee sued under ERISA to challenge the fund's decision. The fund argued that § 302(c)(5) would have prohibited any contributions to the union pension benefit fund on plaintiff's behalf. The district court agreed and "denied coverage for Trust employees on the ground that if Congress had thought they should be included it could have done so; that § 302(c)(5) requires that the fund be for the sole purpose of employees of contributing employers; that this requirement is not satisfied when the Trust effects payments for its employees by bookkeeping transfers; and that a contrary result would enable dishonest trustees to make payments to persons not qualified." *Blassie*, 345 F.2d at 71. Then Judge, later Justice Blackmun, writing for the Eighth Circuit, reversed, holding "[w]e reach the opposite conclusion and hold that the statute does not bar participation of genuine employees of the Trust, and that this agreement's coverage of them is not improper." *Id.*

In reaching its conclusion, the *Blassie* Court first looked to the intent of Congress in enacting § 302. The Supreme Court clearly explained this intent in the earlier case of *Arroyo*.

> 'The provision (§ 302) was enacted as part of a comprehensive revision of federal labor policy in the light of experience acquired during the years following passage of the Wagner Act * * *, and was aimed at practices which Congress considered inimical to the integrity of the collective bargaining process. * * * Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. * * *

18

'Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. * * * To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established.'

*Blassie*, 345 F.2d at 67 (quoting *Arroyo v. United States*, 359 U.S. 419, 425-426 (1959).

Then Judge Blackmun evaluated the application of the statute to contributions made by a union pension benefit fund to itself in the absence of a written agreement in light of this clear congressional purpose. The Eighth Circuit found "nothing abhorrent to the statute or improper in a trust's receipt of contributions (in addition to those from the employer) from the employee . . . or from another source in his behalf, so long as these are with the knowledge and consent of the trustees. . . . The requirement of § 302(c)(5)(B) that the 'basis on which such payments are to be made is specified in a written agreement with the employer' is obviously directed only to the collective bargaining employer's payments and not to such supplemental ones." *Blassie*, 345 F.2d at 69. The court continued to "find nothing of substance in the suggestion that employees of the Trust cannot be beneficiaries because there is no written agreement, applicable to them, of the kind required by § 302(c)(5)(B). This requirement, when viewed in the light of the statute's purpose, impresse[d] [the court] . . . as having application only to those employers subject to collective bargaining procedure with the union. It does not fit the Trust's posture as an employer . . . ." *Blassie*, 345 F.2d at 72.

The courts to have considered *Blassie* have all adopted its reasoning and have extended it beyond union benefit trusts' contributions to themselves to exclude from the purview of § 302(c)(5) the contributions to a union benefit trust from a union acting as an employer on behalf of the union's own employees. *See Garvison v. Jensen*, 355 F.2d 487, 487 (9th Cir. 1966)

(agreeing with *Blassie* to find no § 302 violation where union benefit trusts "permitted the unions in their capacity as employers to make contributions to the trust for the benefit of the unions' employees"); *U. S. Trucking Corp. v. Strong*, 359 F.2d 392, 393 (2d Cir. 1966) (agreeing with *Blassie* to find no § 302 violation where a Union paid contributions on behalf of its own employees into a union benefit fund set up by the union and collective bargaining employers, despite the potential for conflict of interest for union officials, because "[a]ny conflict of interest here is so remote and unlikely that it cannot outweigh the clear legislative intent"); *New York State Teamsters Conference Pension & Ret. Fund v. Hoh*, 554 F. Supp. 519, 528 (N.D.N.Y. 1982) (applying *Blassie* to find no § 302 violation where employers were used by local unions as "conduits" to pay union funds to the trustees of a union benefit fund because there was no risk of interference with union officials or employee representatives from union funds being paid by the union, even indirectly, to a union benefit fund).

This Court too agrees with *Blassie*'s reading of *Arroyo*, and finds that here, even more so than in *Blassie*, *Arroyo*'s specific facts suggest that § 302 should not operate to bar contributions in the absence of a written agreement from one union benefit trust to another union benefit trust of the same union. In *Arroyo*, the Supreme Court was faced with the prosecution of a union official, who served as the union representative on the joint committee administering a union benefit trust fund, for misappropriating money paid by collective bargaining employers that was properly destined for the benefit trust.

> [T]he [official] told the employers' representative that there was to be a union meeting . . ., and that he wanted to exhibit the welfare fund checks to the union members. Accordingly, the [official] was given two checks for $7,500. Attached vouchers identified the checks as the employers' contributions to the welfare fund. . . . Instead of subsequently depositing the checks in the existing welfare fund bank account, however, the [official] used them to open an account in the name of the fund in another bank. A few days thereafter, he gave the bank a purported resolution from the union's board of

> directors authorizing withdrawals from this account upon his signature alone. . . . Over a period of several months . . . the [official] used the money for his own personal purposes and, after transferring the funds to another account, for non-welfare union purposes as well.

*Arroyo*, 359 U.S. at 422.

The Supreme Court, after conducting the analysis of the congressional intent in passing the statute, quoted above in *Blassie*, concluded that "[w]ithout doubt the petitioner's conduct was reprehensible and immoral. It can be assumed also that he offended local criminal law. But, for the reasons stated, we hold that he did not criminally violate § 302(b) of the Labor Management Relations Act of 1947." *Arroyo*, 359 U.S. at 427. If § 302 were merely designed to protect against "reprehensible and immoral" or even illegal conduct on behalf of the trustees, then Defendants' reading of the statute as applicable to union benefit trust funds acting as employers as well as to collective bargaining employers would be compelling. After all, the interests of the beneficiaries of one union benefit trust may not always align with those of the other union benefit trust to which the first seeks to make contributions, creating the potential for abuses in transfers made by the trustees of one fund to another in the absence of a written agreement. But the Supreme Court in *Arroyo* was faced with precisely such disloyal conduct by a union benefit trustee and nevertheless found § 302 to be inapplicable because of the absence of risk to the collective bargaining process. *Arroyo*, 359 U.S. at 424–25 ("When Congress enacted § 302 its purpose was not to assist the States in punishing criminal conduct traditionally within their jurisdiction, but to deal with problems peculiar to collective bargaining.").[5]

---

[5] The *Blassie* court was similarly not dissuaded from its position by the "remote possibility" of a conflict of interest on the part of the contributing union fund. *Blassie*, 345 F.2d at 73 ("[T]he issue is whether the exception language of the statute has been met and satisfied and is not whether the union conceivably has placed itself in a position of conflict of interest. The latter

The most recent case to endorse *Blassie*'s reading of *Arroyo* was even more explicit that the potential for mere conflicts of interest by trustees or union officials is not enough to trigger the prohibition of § 302(c)(5). In *Marangi*, the defendant was a collective bargaining employer seeking to avoid making its contributions to a union benefit fund on the basis that the benefit fund was not legally constituted pursuant to § 302. *Trustees of Int'l Bhd. of Teamsters Local 531 Sick & Welfare Fund v. Marangi Bros.*, 289 F. Supp. 2d 455, 461 (S.D.N.Y. 2003). Specifically, "Defendants argue[d] that making contributions to the Fund would violate § 302 because the Fund pa[id] benefits to employees of the Union as well as employees covered under collective bargaining agreements negotiated with employers. . . . Defendants contend[ed] that, because the Union has not produced a written agreement between itself as an employer and the Fund, any money [Defendants] were to contribute would be in violation of § 302." *Id.* at 461.

The Union, invoking *Blassie* and the cases which followed it, "aver[red] that a written agreement [wa]s not required under the statute" *Marangi*, 289 F. Supp. 2d at 461. The Southern District of New York agreed, holding that the purpose of § 302 was clearly to protect the collective bargaining process from corruption and that "[a]s Judge Blackmun reasoned, there appears to be no danger to the collective bargaining process by allowing the Union to contribute to the Fund in this case, and [insofar] as the Trust Agreement itself does not limit the Union's ability to do so there is no reason to find that the Union must have a written agreement—with itself—that details the basis upon which payments will be made. Therefore, contributions from [defendant] do not fall within the prohibition of § 302." *Marangi*, 289 F. Supp. 2d at 462.

---

does not fall into that category of mischiefs which the legislative history reveals to be the target of the statute.").

Here, the Court finds that the position of the Health Fund, as a BAC union benefit fund, relative to the Pension Plan, another BAC union benefit fund, is comparable to that of the Union in *Marangi* relative to one of its union benefit funds. It is undisputed that the Health Fund has not engaged in collective bargaining with the Union concerning the Health Fund's employees. Mercadante Tr. 118:16-19. Like those courts to have considered this issue before, this Court is mindful of the potential conflict of interest created in extending *Blassie* to the present facts, but, also like the consensus of the courts to consider the issue, this Court finds that the overriding congressional intent in enacting § 302 controls to exclude non-collective bargaining employers like the Health Fund from the purview of the statute.

Defendants seek to distinguish *Blassie* and its progeny on the basis that *Blassie* did not purport to extend its reasoning beyond the employees of the trust from which the employees sought benefits. In this case, the completely analogous circumstance would have been if Plaintiff, as an employee of the Health Fund, had sought to become a beneficiary of the Health Fund, and the Health Fund argued that it could not have legally made contributions pursuant to § 302(c)(5)(B) because it did not have a written agreement with itself concerning Plaintiff. The additional wrinkle in this case is that Plaintiff is the employee of one fund and seeks benefits from a legally distinct separate fund. While the Court agrees that *Blassie* is not factually identical to this case, Defendants have failed to respond to the underlying logic of *Arroyo* upon which the *Blassie* court relied and to the cases which have followed *Blassie* and extended its reasoning to entities legally separate from the recipient union benefit trust, namely the unions themselves. The unambiguous intent of Congress in passing § 302 was to prevent the corruption of the collective bargaining process by illicit transfers from collective bargaining employers to union officials,

23

including trustee representatives of their employees. That intent would not be served by applying the statute indiscriminately to unions and union benefit funds themselves.

In reaching this conclusion, it is important to identify the limits of the Court's present holding. In finding that contributions by the Health Fund and the receipt of contributions from the Health Fund by the Pension Plan in the absence of a written agreement setting forth the detailed basis upon which the contributions would be made are not barred by § 302(c)(5)(B), the Court is not holding that some binding agreement necessarily exists in the absence of a writing. In her motion, discussed at length below, Plaintiff, attempts to read too much into *Blassie* and its progeny. In *Blassie*, Judge Blackmun concluded:

> We hold that the statute does not bar participation of a union's officers and that this coverage, when agreed to by the trustees and permitted by the governing trust agreement on a basis no better than that afforded others, is not improper.

*Blassie*, 345 F.2d at 73. In short, the holding was that contributions to the trust *that had actually been made by the trust as employer* on behalf of an employee of the trust were not barred by § 302, *where permitted by the governing trust agreement*. In other words, the eligibility of the employees of the pension benefit trust in *Blassie* was set forth in a trust agreement to which the employees' employer – the pension benefit trust itself – was a party or at the very least was bound due to the trust agreement's role as the benefit trust's foundational document, and the trust as employer had in fact made contributions.

This case presents the factually distinct circumstance in which Plaintiff, the employee of one union benefit trust – the Health Fund – is attempting to assert her status as a participant in, and eligibility for, benefits from another union benefit trust – the Pension Plan – on the basis of that plan's trust agreement (or the underlying collective bargaining agreement) to which her employer — the Health Fund — is not a party and under which no contributions on behalf of the

employee have been paid. It is undisputed that no contributions, whether required or not, were ever made to the Pension Plan on Plaintiff's behalf. Accordingly, the Taft Hartley Act does not apply in this case and Defendants' motion on that basis is denied.

The denial of Defendants' motion for summary judgment on the basis of § 302, therefore, does not directly lead to the grant of Plaintiff's motion on the merits. It having been established that Plaintiff's participation in the Pension Plan was not barred by § 302 as a matter of law, Plaintiff must still produce sufficient facts demonstrating the existence of some agreement actually making her a participant, obligating the Health Fund to make contributions on her behalf, and obligating the Pension Plan to pay her benefits.

## 2. Plaintiff's Motion on the Merits

As explained above, it is important to note that this Court's holding on the Taft Hartley Act resolves only the question of whether Plaintiff is legally barred from being a participant in the Pension Plan; it does not resolve the separate issue of whether Plaintiff is in fact a participant with standing to sue Defendants under ERISA. In Plaintiff's motion and reply briefing, most of which is directed to Defendants' Taft Hartley Act arguments, the Court has been able to identify three distinct theories of how Plaintiff alleges she is a "participant" entitled to benefits under an agreement to which neither she nor her employer was a signatory. Firstly, Plaintiff references Mr. Mercadante's deposition testimony to argue that the Health Fund is a party to the collective bargaining agreement establishing the Pension Fund and is bound by its terms. Plaintiff relies upon the following Mercadante testimony:

> Q: To your knowledge, did the Health Fund have an obligation to pay fringe benefits under a collective bargaining agreement?
> A: The fund had an obligation to pay what was negotiated for this particular person, what was paid, yes.

Q: But that's not what I asked you. Was the Health Fund a party to a collective bargaining agreement?

A: Not in Mrs. Fiorentino's case.

Q: In any case?

A: Well –

Q: To your knowledge, is the Health Fund – has the Health Fund ever been a party to any collective bargaining agreement?

A: Absolutely.

Q: What collective bargaining agreement?

A: The collective bargaining – the union's collective – Local 4's collective bargaining agreement. The Council's collective bargaining agreement right now.

Q: It's your understanding that the Health Fund is a party to that agreement?

A: Yes.

Q: Is it your understanding that the Health Fund signs that agreement?

A: No, not per se.

Q: "Not per se"?

A: No.

Q: Is it your understanding that the Health Fund has any obligations to make contributions under any collective bargaining agreement?

A: As part of the collective bargaining agreement, that's one of the benefits that's collectively bargained.

Mercadante Tr. 183:21-185:5. From this exchange, Plaintiff concludes that Mr. Mercadante testified that the Health Fund was a party to the Union's collective bargaining agreement providing for the Trust Agreement which established the Pension Plan.

As an initial matter, the Court finds this testimony insufficient to form the basis of a grant of summary judgment. The testimony is unclear in that Mr. Mercadante testified that the Health Fund was a party to the agreement, but was not a signatory to it. It seems that Mr. Mercadante, a non-lawyer, may not have appreciated the legal implications of the language he used in referring to the Health Fund as a "party" to the collective bargaining agreement. This impression is

reinforced by the testimony to which the Defendants direct the Court in response. Shortly after

the exchange relied upon by Plaintiff, Mr. Mercadante testified as follows:

> Q: To your knowledge, has the Health Fund ever signed a collective bargaining agreement that required it to make contributions to any of the benefit funds?
>
> A: Legally?
>
> Q: No. Factually.
>
> A: Factually. Excuse me that I'm not answering so quickly here, because you're asking me if there's a signature – so, if you're asking me did the Health Fund sign like a contractor would sign? Is that what you're asking me?
>
> Q: Yes. That's what I'm asking you.
>
> A: My answer would be no. However, via the – and again, I'm not a lawyer here and there's something that I'm thinking of here that – that the funds – no, I'm going to say no, no. So, no, not like a contractor would sign, no.

Mercadante Tr. 188:23-189:14. Mr. Mercadante appears to clarify that his earlier testimony did

not mean that the Health Fund signed onto the collective bargaining agreement in the same

manner in which the Collective Bargaining Employers (the contractors) did. At the stage of

summary judgment, the Court is not permitted to determine as a matter of fact that a collective

bargaining agreement existed based upon Mr. Mercadante's internally conflicted statement, nor

can the Court make the determinations as to Mr. Mercadanate's credibility necessary to find the

relative weight his statements should be given. Accordingly, Mr. Mercadante's ambiguous

statements during his deposition, which he later appeared to clarify, cannot entitle Plaintiff to

judgment as a matter of law.

Secondly, Plaintiff appears to assert throughout her moving papers that the terms of the

Pension Plan Document itself somehow create an enforceable entitlement to benefits in her,

despite the fact that neither she nor her employer is a party to the Trust Agreement creating the

Pension Plan or the underlying CBA providing for the Trust Agreement. Plaintiff's arguments

directed at interpreting the Plan Document's eligibility criteria may have merit if the Pension

Plan is bound to apply them with respect to Plaintiff.[6] The threshold legal question, however, is by what mechanism Plaintiff, as the employee of a non-signatory employer, the Health Fund, would be empowered to enforce the eligibility provisions in the Pension Plan Document against the Pension Plan. Plaintiff's novel argument, unsupported by any cited law, that the Pension Plan Document itself somehow does so, is not convincing.

---

[6] Plaintiff's argument relies exclusively on the terms of the Plan Document. Article I, section 12(a) of the Plan Document, which defines an "Employee" to include "[e]ach employee of the trustees of the benefit funds of the Union," and Article I, section 13(c) defines "Employer," among other things, as "[t]he Union and the trustees of benefit funds of the Union." *Id.* at Article 1(13(c).  Article I, section 25 defines a "Participant" as including, *inter alia*, "a former Employee who has a non-forfeitable right to receive a retirement pension and an eligible Employee." *Id.* at Article 1 (25). Article I, section 25 further states that: "[a]n Employee shall become an eligible Employee on the first anniversary of his first Hour of Service on which he has completed 700 Hours of Service during the 12-month period preceding such anniversary." *Id.* In addition, the Plan Document defines "Hour of Service" as "[e]ach hour for which a person is paid or entitled to payment by an Employer for the performance of duties during a Plan Year." *Id.* at Article (21). After an Employee becomes a Participant, the Employee earns Credited Service in each Plan Year in accordance with the formula set forth in Article II of the Plan Document. The Plan Year is the calendar year. *Id.* at Article I (27). Prior to 2003, such Employees earned a full year of Credited Future Service for each Plan Year in which they worked at least 700 Hours of Service; thereafter, they earned a full year of Credited Future service for each Plan Year in which they worked at least 800 Hours of Service. *Id.* at Article II (2). Employees who become Participants earn Vested Credit on the same basis as Credited Future Service. *Id.* at Article II (3)(B). Such Employees acquire a non-forfeitable right to their Accrued Benefits after accumulating five years of Vested Credit. *Id.* at Article VI (1).

Plaintiff contends that (i) the Health Fund is an "Employer" as defined by the Plan Document because it is one of the benefit funds of the Union; (ii) Plaintiff was an "Employee," as defined by the Plan Document, because she was employed by the Health Fund, one of the "benefit funds of the Union"; (iii) Plaintiff was employed by the Health Fund on a full-time basis from 1997 through 2014 and accordingly satisfied the Hours of Service requirement by 1999, at the latest, and became a "Participant" in the Pension Plan no later than January 1, 1999; (iv) thereafter, she earned a full year of Credited Future Service for each Plan Year from 1999 until at least 2013 and acquired a non-forfeitable right to her Accrued Benefits no later than 2003, by which time she had accumulated at least five years of Vested Credit; and accordingly, when Plaintiff resigned from her position in 2014, she departed with a non-forfeitable right to receive retirement benefits from the Pension Plan, and therefore, continues to be a Participant as defined in the Plan Document. The Court does not reach the merits of this interpretation because, as explained elsewhere in the opinion, there are insufficient facts to rule on the necessary antecedent question of Plaintiff's statutory standing as a "participant."

Although the parties have not provided the Court with any binding precedent on whether a pension plan document can be self-enforcing as Plaintiff suggests, and the Court has been unable to identify any, the Fourth Circuit faced a similar question in *Sargent v. Holland*, 114 F.3d 33 (4th Cir. 1997).[7] The plaintiff in *Sargent* was a miner and UMWA union member who had applied for disability benefits from the United Mine Workers of America 1974 Pension Trust after having been injured in a mine accident. The Pension Trust denied Sargent's claim because, at the time of the accident, Sargent was employed by a mine operator which had not executed any agreement with the UMWA or the Pension Trust; in other words, plaintiff's employer was a "non-signatory" to the governing collective bargaining agreement and trust agreement. Sargent sued the Pension Trust and its trustees for breach of fiduciary duty, arguing that he should not have been denied benefits because he had satisfied all of the eligibility requirements set forth in the Pension Trust's plan document.

The plan document required that to be eligible for a disability pension, a participant would have to have ten years of prior service at a signatory employer and become totally disabled as a result of a mine accident. The Pension Trust admitted that Sargent had worked for ten years at a signatory employer prior to taking a job with the non-signatory employer by whom he was employed at the time of the accident and that he had indeed been totally disabled in a

---

[7] Defendants heavily rely upon the Ninth Circuit's decision in *Guthart v. White*, 263 F.3d 1099 (9th Cir. 2001), for the proposition that eligibility criteria in a plan document are not binding in the absence of another agreement. *Guthart*, however, was a Taft Hartley Act case involving the employee of an employer subject to collective bargaining with the plaintiff's union, unlike the Health Fund in this case. Moreover, the trust agreement in *Guthart*, unlike the case at bar, clearly provided that an eligible employee was "a person who is employed by an employer and for whom contributions to the trust fund have been made or are required *pursuant to a collective bargaining agreement*." *Id.* at 1104 (emphasis added). The trust agreement in *Guthart* thus did not on its face even arguably support plaintiff's claim to benefits based on contributions not made pursuant to a separate collective bargaining agreement. The Defendants have not pointed to any comparable language in the Plan Document, and this Court has identified none.

mine accident. The Pension Trust argued that it nevertheless denied Sargent's claim because the provision of the plan document did not apply because Sargent's employer at the time of the accident was a non-signatory to the plan's trust agreement. Accordingly, because Sargent was not totally disabled in a mine accident *while working for a signatory employer*, he was not entitled to benefits under the plan document established by agreement between the union and the signatory employers. The district court agreed with the Pension Trust and granted defendant summary judgment on the merits.[8] Sargent appealed. The Fourth Circuit affirmed, holding:

> The 1974 Plan is the product of negotiations between the UMWA and certain coal operators. It is designed to provide disability and pension benefits to the employees of these coal operators, in compliance with ERISA requirements. The Trust is funded by these signatory employers. The Trustees' interpretation of "mine accident" is thus consistent with the purpose of the Plan to direct Plan resources to workers employed by signatory employers. And, as the district court noted, it would be "untenable" to suggest that signatory employers intended funds from the Trust to subsidize the benefit plans of non-signatory employers whose employees were injured in mine accidents.
>
> . . .
>
> Contrary to Sargent's contention, the Trustees' definition of "mine accident" does not run afoul of the Plan's plain language. Nothing in the 1974 Plan suggests that signatory employers should subsidize the costs of injuries at non-signatory mines. The Plan does not explicitly limit "mine accident" to "signatory mine accident," just as it does not explicitly limit "mine accident" to "coal mine accident." It would be ludicrous to suggest, however, that the Trust is required to disburse benefits to miners injured in gold mine or copper mine accidents. It would similarly frustrate the purpose of the Plan to insist that the Trust cover workers injured at non-signatory operations. The identities of the parties to the agreement and purpose of the Plan preclude these readings of "mine accident." The Trustees simply articulated . . . what is inherent in the Plan.

*Sargent*, 114 F.3d at 36.

---

[8] This Court looks to *Sargent v. Holland* for its reasoning, not necessarily its holding on the merits. The procedural posture of the court's consideration of the denial in *Sargent* was considerably different than in the case at bar, as the plaintiff had made a formal application, received a formal denial, and been given an administrative appeal before a plan hearing officer, clearly entitling the decision to a deferential standard of review under *Firestone*. Additionally, the defendant in Sargent had moved at the summary judgment stage for judgment on the merits, rather than on the basis of the application of the Taft Hartley Act.

The question in this case, similar to the question in *Sargent*, is thus whether the terms "Employee" and "Employer" defined in the Pension Plan Document, Art. I(12)-(13), create some legal right in Plaintiff despite the fact that neither she nor her employer are signatories of the underlying collective bargaining and trust agreements that authorize the Trustees to draft the Plan Document in the first instance. In the absence of any law suggesting as much, and in view of the clear purpose of the Pension Plan as set forth in the Trust Agreement, the Court concludes that they cannot. *See* Trust Agreement p. 1 ("WHEREAS, the Union and the Employers have entered into a collective bargaining agreement effective May 1st 1959 *requiring payments by the Employers for the purpose of providing a pension program*") (emphasis added). As the moving party, Plaintiff bears the burden of demonstrating her entitlement to judgment as a matter of law. Plaintiff has made a potentially viable argument interpreting the eligibility criteria of the Plan Document, but provides no support for how the plan document, standing alone, actually binds the Defendants for the benefit of Plaintiff.[9]

As her final argument, Plaintiff contends that the Health Fund's course of conduct evinces an intent to be bound to the Local 4 CBA and Trust Agreement, thus applying their terms to the Health Fund as a non-signatory and rendering Plaintiff a "participant" in the Pension Plan as a Health Fund employee. In particular, Plaintiff identifies the Health Fund's course of conduct

---

[9] The Court finding no legal basis for Plaintiff's claim of an enforceable right to benefits in the absence of any agreement to which either the Plaintiff or her employer was a signatory, the Court observes as an alternative and sufficient basis for the denial of Defendants' Taft Hartley Act motion that the only other theories of liability presented by Plaintiff – a written agreement executed by the Health Plan according to Mr. Mercadante's testimony or a written agreement binding the Pension Plan and the Health Plan by virtue of the Health plan's course of conduct – rely upon written agreements that might satisfy the requirements of the Act even were it to apply. It does not appear that the parties would dispute that the CBA in evidence would satisfy the Taft Hartley Act were the Act to apply. Moreover, it is clearly Defendants' position that the CBA, the Trust Agreement, and the Plan Document all comply with the restrictions of the Taft Hartley Act.

in submitting contributions to the Pension Plan on behalf of Mr. Mercadante, Ms. Meudt, and Ms. Ives as binding the Health Fund to abide by the requirements of the CBA and/or Trust Agreement for all Health Fund employees, including Plaintiff.

Unlike Plaintiff's self-enforcing theory, Plaintiff's third theory, implicates a well-established line of precedent in this Circuit. The Third Circuit has held that, "[i]n the field of labor relations, the technical rules of contract law do not determine the existence of an agreement." *Mack Trucks, Inc. v. Int'l Union, United Auto., etc*., 856 F.2d 579, 591-92 (3d Cir. 1988). Indeed, the "[a]doption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound." *Id.* at 592. Nevertheless, a court may only find that a non-signatory is bound by a CBA where: "(1) [there is] a writing that clearly refers to the CBA and (2) [the] conduct of the defendant . . . "evidences an intent to be bound by the [CBA] despite a lack of written consent." *N.J. Reg'l Council of Carpenters v. Jayeff Constr. Corp*., 495 F. App'x 230, 233 (3d Cir. 2012) (citing *Residential Reroofers Local 30-B Health & Welfare Fund v. A & B Metal & Roofing, Inc*., 976 F. Supp. 341, 344 (E.D. Pa. 1997)).

Moreover, in determining whether an employer's course of conduct binds the employer to the applicable CBA, courts have examined, for example, whether the defendant-employer: (a) remitted fringe benefit contributions and union dues; (b) paid union scale wages, as opposed to varying wages; (c) hired non-union workers, in addition to union workers, to perform work covered by the CBA; and (d) voluntarily submitted to an audit by the Funds. *See Firesheets v. A.G. Bldg. Specialists*, 134 F.3d 729, 731 (5th Cir. 1998); *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc*., 385 F.3d 761, 766 (7th Cir. 2004). Importantly, the aforementioned factors are not exhaustive; rather, they are simply "specific examples which may suggest a party's intent to be bound by the terms of a collective

bargaining agreement." *Int'l Union of Operating Eng'Rs Local 542 v. Williams Equip. Corp*., 2006 U.S. Dist. LEXIS 68172, at *15 (E.D. Pa. Sep. 19, 2006).

As a threshold matter, Plaintiff argues that *Jayeff* and *Firesheets* are not relevant to this matter because the Taft Hartley Act's writing requirement does not apply, so Plaintiff may have an entitlement to benefits in the absence of a written agreement. Again, this misses the point. In this case, Plaintiff is trying to enforce an agreement to which neither she nor her employer is a party. The Third Circuit has provided a mechanism for employees in Plaintiff's position to enforce such agreements in the ERISA context, but that mechanism, independent of any statute, requires a writing.

Applying *Jayeff*, then, Plaintiff has identified the language contained in the 1998-2006 remittance reports stating that "[b]y forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said Funds;" and the language contained in the 2011-present remittance reports stating that "the below listed employees represent all of the employees employed under the terms of an Agreement between the employer and BAC Local 4 and as provided for in the applicable Fringe Benefit Trust Agreements," as potentially providing the basis of the Health Fund's intent to be bound by the Pension Plan's Trust Agreement and/or the underlying CBA.

The Court finds that these statements may satisfy *Jayeff*'s requirement that a writing clearly refer to the contract to which the employer is to be bound, but the Court does not decide the issue, because Plaintiff has clearly failed to satisfy the second prong of *Jayeff* by offering conduct by the Health Fund demonstrating its intent to be bound by the CBA in the absence of an explicit written agreement. The undisputed facts show that the Health Fund had approximately

six employees for much of the time during which Plaintiff was employed there (with the actual number varying over time). The Health Fund contributed to the Pension Plan for three of these employees, but did not contribute for at least two of the remaining three. Beyond the fact of the contributions for the three employees and the text of the remittance reports themselves, Plaintiff has provided little to no additional evidence of conduct suggesting an intent to be bound by either the Trust Agreement or the CBA. Plaintiff has not, for example made any showing of the remittance by the Health Fund of union dues, the paying of union scale wages, as opposed to varying wages[10]; the hiring of non-union workers, in addition to union workers, to perform work covered by the CBA[11], nor the voluntarily submission of the Health Fund to an audit by the Pension Plan. More troubling still, the only CBA in the record covers at most only half of the period of Plaintiff's employment, making a point-by-point evaluation of the Health Fund's compliance or noncompliance with its terms over the entire period of her employment impossible. [Agreement Between Building Contractors Association of New Jersey Building Contractors Association of Atlantic County Other Signatory Employers and The International Union of Bricklayers and Allied Craftworkers / Administrative District Council of New Jersey, Local Union Nos. 2, 4 & 5, effective November 1, 2007 through April 30, 2012 (the "CBA")]. This Court cannot find that the Health Fund's conduct evinces its intention to be bound to a document, the precise terms of eight years of which remain a mystery.

---

[10] In fact, the undisputed facts indicate that Mr. Mercadante believed employee compensation to be within his discretion as fund administrator, and that he acted upon this belief by awarding wages and benefits to employees based on his subjective evaluation of their performance. Mercadante Tr. 148:13-151:3; 155:12-19; 159:4-6; 162:14-163:18.

[11] Indeed, the Health Fund clearly did not hire workers to perform work of the type covered by the CBA, which is primarily concerned with the activities of bricklayers and allied craftworkers, not clerical office employees. [CBA Art. III; Art. IV(A)].

In their Reply, Defendants also point out numerous elements of the only CBA in evidence that do not align with the Health Fund's conduct. At the most basic level, the CBA covers employees "in the classifications of work falling within the jurisdiction of the Union" and such classifications include "brick masonry, stone masonry, artificial masonry, cement masonry, plastering, firebrick, pointing, caulking, and cleaning."[CBA Art. III; Art. IV(A)]. Nowhere mentioned are clerical office workers like Plaintiff, and the work hour and occupational safety requirements of the CBA are replete with references to work conducted on construction sites by the named trades that are simply inapplicable to Plaintiff. *See, e.g. id.* at Art. III(D)(2) ("Hard hats are to be supplied by each employer"); *id.* at Art. III(D)(6) ("in order to protect the health and safety, of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units, by the means of hand-held, gas-powered, or electrical, portable 'chop saws' and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects."). Moreover, it is undisputed that the Health Fund submitted remittance forms for some, but not all employees, as would have been required were all employees subject to the CBA. [Plaintiff's ¶ 47]. Finally, there is no evidence that the Health Fund complied with any of the other contribution requirements of an employer under the CBA, such as employer contributions to the Industry Advancement Fund, the International Masonry Institute, or the NJ BAC/ADC Apprentice Training & Education Fund. [CBA, Art. XI(E)-(G)].

In sum, just as the Court observed in *Jayeff*, "[t]here is no precedent to support the [Plaintiff's] position that an employer that has not signed a CBA can nevertheless be bound by all of the provisions of the CBA solely from signing remittance forms. Although a signed remittance form[] is entitled to some weight, it is but one factor that must be examined in analyzing a defendant's conduct; the form, alone, is not enough to bind a non-signatory employer

to a CBA." *Jayeff*, 495 F. App'x at 234. At this stage in the proceeding, Plaintiff has not come close to presenting the kind of detailed factual analysis that would be required to establish the requisite course of conduct factors necessary to bind the Health Fund to the agreements underlying the Pension Plan and thereby bind the Pension Plan to provide benefits to Health Fund employees.

The Court having found no basis on which the Plaintiff has demonstrated entitlement to judgment as a matter of law, Plaintiff's motion for summary judgment is denied.

In sum, the Defendants have failed to show that the application of the Taft Hartley Act renders Plaintiff legally incapable of having been a participant in the Pension Plan and therefore lacking a colorable claim to benefits under ERISA, but Plaintiff has also failed to prove her participant status on the basis of the undisputed facts and therefore her entitlement to benefits as a matter of law. Accordingly, the issue of Plaintiff's statutory standing to bring § 1132 and § 1104 claims remains unresolved on the motions presently before the Court. Because statutory standing is "not jurisdictional" and merely an element of Plaintiff's claims, however, the Court can and does proceed to consider Defendants' argument in the alternative, that the applicable statutes of limitations bar Plaintiff's claims, regardless of her participant status. *Leyse*, 804 F.3d at 320 ("Statutory standing . . . does not limit the power of the court to adjudicate the case." (citing *Lexmark,* 134 S.Ct. at 1388 & n.4)).

**B. Statute of Limitations**

"ERISA contains a statute of limitations for claims alleging a breach of fiduciary duty, but no limitations period for non-fiduciary claims. . . . Moreover, ERISA, enacted in 1974, is not subject to 28 U.S.C. § 1658, which prescribes a default, four-year limitations period for claims

arising under acts of Congress enacted after December 1, 1990." *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007) (citations omitted).

As to Count I, because there is no specific federal statute of limitations governing non-fiduciary duty claims under an ERISA plan (including claims for benefits), this Court must look to the "limitations period applicable to the forum state claim most analogous to the ERISA claim at hand." *Romero v. Allstate Corp.*, 404 F.3d 212, 220 (3d Cir. 2005) (quoting *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1180 (3d Cir. 1992)). In claims for benefits under 29 U.S.C. § 1132(a)(1)(B), the District of New Jersey has adopted the six year statute of limitations of state contract claims. *Starr v. JCI Data Processing, Inc.*, 767 F. Supp. 633, 638 (D.N.J. 1991).

As to Count II, under ERISA, the statute of limitations for a breach of fiduciary duty claim is the earlier of:

> **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

> **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

"Under 29 U.S.C. § 1113(2), 'actual knowledge of a breach or violation' requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Gluck*, 960 F.2d at 1177 (citations omitted); *see also Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 511 (3d Cir. 2006) (where a claim is for breach of fiduciary duty, to be charged with actual knowledge "requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated."). Accordingly, in conducting the limitations analysis for Count II, "[t]wo

temporal determinations must then be made: the date of the last action which formed a part of the breach and the date of the plaintiff's actual knowledge of the breach." *Gluck*, 960 F.2d at 1178. Defendants contend that they could be entitled to the three year period on the basis of Plaintiff's actual knowledge under § 1113(2), but that it makes no difference whether the three or six year period applies due to the early date of Plaintiff's actual knowledge that she was not a plan participant. Accordingly, viewing the facts in the light most favorable to Plaintiff, for both Counts I and II, the longest statute of limitations period applicable would be six years.

Having determined that a six year statute of limitations applies to Count I, the Court next determines the date on which Plaintiff's claim accrued. "[T]he accrual date for federal claims is governed by federal law, irrespective of the source of the limitations period." *Miller v. Fortis*, 475 F.3d at 520. To determine the accrual date of a federal claim, the courts in this Circuit utilize the federal "discovery rule" when there is no controlling federal statute. "Under this rule, a statute of limitations begins to run when a plaintiff discovers or should have discovered the injury that forms the basis of his claim." *Id.* at 520 (3d Cir. 2007).

"Under the general formulation of the discovery rule, a claim will accrue when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Romero*, 404 F.3d at 222. "The rule that has developed in the more specific ERISA context is that an ERISA non-fiduciary duty claim will accrue after a claim for benefits due under an ERISA plan has been made and formally denied." *Id.* "Occasionally, however, an ERISA non-fiduciary claim will accrue before a formal application is made and/or before benefits are formally denied, such as when [1] there has been a repudiation of the benefits by the fiduciary [2] which is *clear* and made known to the beneficiary." *Id.* at 222–23 (citations omitted) (emphasis in original). *See also Miller v. Fortis*, 475 F.3d at 520–21 ("In the ERISA

context, the discovery rule has been 'developed' into the more specific 'clear repudiation' rule whereby a non-fiduciary cause of action accrues when a claim for benefits has been denied. Notably, a *formal* denial is not required if there has already been a repudiation of the benefits by the fiduciary which was *clear* and made known the beneficiary. . . . In other words, some 'event other than a denial of a claim' may trigger the statute of limitations by clearly alerting the plaintiff that his entitlement to benefits has been repudiated." (emphasis in original)).

Here, there has been no formal application for benefits and no formal denial of Plaintiff's claim, although Plaintiff, through counsel, did request an application for benefits. The clear repudiation standard is thus the more appropriate basis for determining the accrual date of Plaintiff's Count I claim. In determining whether there has been a repudiation by the fiduciary under step 1 of the *Romero/Miller* test, the Third Circuit has held that a repudiation occurs where there is conduct by the fiduciary which is "adverse to the beneficiary." *Miller v. Fortis*, 475 F.3d at 521. The Third Circuit then looks to the definition of an "adverse benefit determination" under 29 C.F.R. § 2560.503–1(m)(4) in evaluating the fiduciary's conduct. *Id.* § 2560.503 provides in relevant part:

> The term "adverse benefit determination" means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503–1(m)(4). The court in *Miller* relied upon the portion of § 2560.503 defining an adverse benefit determination to include "a denial, reduction, or termination of, or a

failure to provide or make payment (in whole or in part)" to find that "[l]ike a denial, an underpayment is adverse to the beneficiary and therefore repudiates his rights under a plan."

*Miller v. Fortis*, 475 F.3d at 521.

Plaintiff filed the Complaint in this case on March 23, 2015. Accordingly, in order to be timely, Plaintiff's claims under either ERISA provision must have accrued no earlier than March 23, 2009.

Plaintiff argues that the August 2014 letter from Mr. Mercadante constitutes either a denial or a clear repudiation of Plaintiff's benefits, both in his failure to provide Plaintiff with an application for benefits and his unequivocal statement that Plaintiff was not a Pension Plan participant. In 2014 Mr. Mercadante was fund administrator for, *inter alia*, the Pension Plan. His written statement that Plaintiff was not a participant in the Pension Plan acts as the equivalent of a denial of benefits and is a clear repudiation. Plaintiff's knowledge of that repudiation is demonstrated in the record and conceded by Plaintiff.

Defendants however, argue that a repudiation occurred before August 2014. Defendants propose two potential points at which the alleged earlier repudiation may have occurred. The first is based on Plaintiff's deposition testimony that in 1998 she was aware that she was not a participant in the Pension Plan.

> Q: Okay At some point did you come to learn that you were not receiving the Local 4 Pension?
>
> A: My first year review.
>
> Q: In you first year review?
>
> A: I was there a year, yes.
>
> Q: Okay. And what did you hear at your first year review about the Local 4 Pension?

A: He [Mercadante] told me he couldn't do it. He couldn't give it to me.

Q: Okay. So that was in 1998?

A: Yes.

Q: Okay. And what did you say about that?

A: I told him that I was – I was entitled to the pension, Annuity and the International Pension.

Q: Okay. And what did he say?

A: He told me he couldn't do it. So even the Annuity and the International Pension.

Q: He couldn't do any of them, he said?

A: Yes.

. . .

Q: Right. Okay. But you were aware, since '98 or '99, that the Health Fund was not making contributions to the Local 4 Pension Fund on your behalf; correct?

A: Yes.

Fiorentino Tr. 14:25-15:20; 22:25-23:2. Plaintiff disputes the meaning of this testimony, contending that Plaintiff merely meant that as of that date she had been told by her supervisor, and the chief and primary representative of her employer, the Health Fund, Mr. Mercadante, that she would not be able to participate in the plan. The Court cannot at this stage adjudicate disputes of fact, and instead looks to the undisputed facts in finding this incident insufficient to constitute a clear repudiation. Firstly, it is undisputed that Mr. Mercadante did not become the administrator of the Pension Plan, and thus a fiduciary of the beneficiaries of the Plan, until sometime in 2000 at the earliest. By Defendants' own reckoning, Mr. Mercadante was not a fiduciary of the Pension Plan until June 8, 2006. Mr. Mercadante thus did not possess the authority as a Pension Plan fiduciary to repudiate Plaintiff's alleged entitlement to benefits until some point between 2000 and 2006. Accordingly, in 1998, Mr. Mercadante could not have made

41

"a repudiation of the benefits *by the fiduciary*" because he was a fiduciary of the Health Fund only, not the Pension Plan. Moreover, any understanding that Plaintiff had in 1998 could thus not have been a knowing one, as no fiduciary of the Plan had yet communicated with her.

Acknowledging this time discrepancy, Defendants suggest as the second possibility, that Plaintiff had an oral conversation with Mr. Mercadante every year of her employment at her annual reviews in which she would ask for the Pension Plan benefit and would be denied by Mr. Mercadante, including at reviews each year after Mr. Mercadante became a fiduciary of the Pension Plan in June 2006. In support of this contention, Defendants provide Plaintiff's own deposition testimony.

> A: I was aware. That's why every year, on my yearly review, I asked him for it, every year, because I, in my mind, I thought, well, he's going to give it to me.
>
> Q: Right.
>
> A: It's just a matter of time, I'm going to get it.
>
> Q: Okay. So at least once a year you would mention it to him?
>
> A: I asked him every year.
>
> . . .
>
> A: When I asked him, during my review, he would say, "I just can't do it, Angela. I just can't do it."

Fiorentino Tr. 23:4-23:13; 24:13-24:16. Plaintiff contests Defendants' characterization of her testimony in a certification filed along with her opposition to Defendants' motion. Plaintiff contends that she testified only that in 1998, her superior at the Health Fund, Mr. Mercadante told her that "he just couldn't do it" when she asked whether she was receiving benefits from the Pension Plan. Plaintiff further certified that she "first learned that Defendants had denied me the right to participate in the Pension Plan in August 18, 2014." March 4, 2016 Fiorentino

Certification. Plaintiff's certification, however, does not contest her testimony that she raised her participation in the Pension Plan with Mr. Mercadante "every year" and that at those reviews, Mr. Mercadante again stated that he could not enroll her as a participant in the Pension Plan. It is therefore undisputed that Plaintiff was informed by Mr. Mercadante at each of her annual reviews, including those reviews after Mr. Mercadante became a fiduciary of the Pension Plan in June 2006, that Plaintiff was not a participant in the Pension Plan.

To the extent that Plaintiff's certification seeks to contradict her earlier deposition testimony, it is unavailing. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. [The Supreme Court's holding in] *Liberty Lobby* specifically recognizes the trial judge's power to grant summary judgment on disputed records. Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). In her deposition testimony Plaintiff plainly and unambiguously stated that on the basis of what Mr. Mercadante told her at her annual reviews, in 1998 and every year thereafter, she was aware that she was not receiving the Pension Plan as an employee benefit and that no contributions were being made by the Health Fund to the Pension Plan on her behalf. Subsequent statements made in a certification that she was not so aware are contradictory, unreliable, and are appropriately disregarded by this Court. *See id.* at 253-54 ("The main practical reason supporting

the sham affidavit doctrine is that prior depositions are more reliable than affidavits. '[T]he deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.' . . . Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

As an alternative argument, Plaintiff contends that, although Mr. Mercadante may have informed Plaintiff she was not a participant in the Pension Plan, he was never a fiduciary of the Plan with the capacity to repudiate her rights because only the Trustees and not the fund administrator constitute "the fiduciary" under the Pension Plan. In support of this contention, Plaintiff offers only the language of the Summary Plan Description ("SPD") that "[t]he Trustees are responsible for the operation of the Plan" and "[i]f your request for a benefit under the Plan is denied by the Trustees, you will be advised in writing of the denial, and the specific reasons therefor, by the Trustees." *Id.* at 14, 28. As an initial matter, the Court observes that nothing in the SPD is inconsistent with the appointment by the Trustees of an administrative manager who would constitute a fiduciary under ERISA. "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan. Accordingly, [f]iduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions. The definition of a fiduciary under ERISA is to be broadly construed." *Edmonson*, 725 F.3d at 413 (alteration in original, internal quotations omitted). As

44

fund administrator charged with overseeing and approving all of the day-to-day operations of the Pension Plan, Mr. Mercadante was clearly a fiduciary of the Plan.[12]

Secondly, the clear language of the Trust Agreement and the Plan Document contemplate the appointment by the Trustees of an administrative manager acting as Plan fiduciary. *See* Trust Agreement Art. II(4)(2) ("The Trustees shall promptly agree upon and formulate the provisions, regulations and conditions of the pension plan herein contemplated, including . . . all other matters relating thereto which the Trustees deem appropriate for the determination of benefits and the administration of the program."); Plan Document Art. XI(1) ("The Trustees are named fiduciary who shall control and manage the operation and administration of the Plan, *or designate an administrative manager for such purposes*." (emphasis added)). To the extent anything in the SPD purports to conflict with the clear authorization of the Plan Document, this Court finds, as Plaintiff herself observed in briefing, that the Plan Document controls by the SPD's own unambiguous language. *See* Summary Plan Description, p. 14 ("This summary is not intended to change in any way the provisions of the Pension Plan."); *Cottillion v. United Ref. Co.*, 781 F.3d 47, 60 (3d Cir. 2015) (holding that based on the written disclaimer in the SPD, the plan document controls where it conflicts with the SPD).

Reviewing the undisputed facts, the Court finds that, at her deposition, Plaintiff testified that Mr. Mercadante informed Plaintiff at each of her annual review meetings that she was not a participant in the Pension Plan. After June 8, 2006, Mr. Mercadante, as fund administrator, was a

---

[12] The Court also observes the inherent tension in Plaintiff's challenge to Mr. Mercadante's status as a fiduciary, given that the only adverse benefit determination made in this case from Plaintiff's perspective is again a communication from Mr. Mercadante made in an August 2014 letter: a communication that Plaintiff was not a participant in the Pension Plan that was not substantively different from the oral communications she received annually at her reviews.

fiduciary of the Pension Plan. Accordingly, depending upon the time of the year at which Plaintiff's annual reviews were held, it is conceded by the Plaintiff that in either 2006 or 2007, Mr. Mercadante, as a fiduciary of the Pension Plan informed Plaintiff that she was not a participant in the Pension Plan. Construing the facts in the light most favorable to Plaintiff, the Court will use December 31, 2007 as the date of Mr. Mercadante's conduct. Under 29 C.F.R. § 2560.503-1(m)(4), "[t]he term 'adverse benefit determination' means any of the following: a denial, reduction, or termination of . . . a benefit, including any such denial, reduction, termination, . . . that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan . . . ." Accordingly, Mr. Mercadante's representation to Plaintiff, on or before December 31, 2007, that she was not a participant in the Pension Plan was adverse to Plaintiff and therefore repudiated her rights under the plan. *See, e.g. Christian v. Honeywell Ret. Ben. Plan*, 582 F. App'x 103, 104–05 (3d Cir. 2014) (repudiation was clear and made known to plaintiff where plaintiff "spoke with the Plan's representatives . . . and was informed that all benefits would be terminated"). As the limitations period for Plaintiff's claim extends back only to March 23, 2009, her ERISA benefits claim is untimely provided that the other prong of the *Romero/Miller* test is met.

The remaining question therefore is whether under step 2 of the *Romero/Miller* test, the Pension Plan's repudiation was clear and made known to the Plaintiff. "[S]tatutes of limitations are intended to encourage 'rapid resolution of disputes, repose for defendants, and avoidance of litigation involving lost or distorted evidence.' These aims are served when the accrual date anchors the limitations period to a plaintiff's reasonable discovery of actionable harm. This ensures that evidence is preserved and claims are efficiently adjudicated. In contrast, a statute of limitations not based on reasonable discovery is effectively no limitation at all." *Miller v. Fortis*,

475 F.3d at 522 (quoting *Romero,* 404 F.3d at 223). *See also Dix v. Total Petrochemicals USA,*

*Inc., Pension Plan*, 540 F. App'x 130, 134 (3d Cir. 2013) ("as we explained in *Miller,* 'a statute

of limitations not based on reasonable discovery is effectively no limitation at all'").

"ERISA does not require 'plan participants and beneficiaries likely unfamiliar with the

intricacies of pension plan formulas and the technical requirements of ERISA, to become

watchdogs over potential plan errors and abuses,'" but ERISA also does not relieve a plaintiff of

the need to be "vigilant" when conduct by the fiduciary alerts him or her to an adverse action.

*Miller v. Fortis*, 475 F.3d at 522 (quoting *Romero,* 404 F.3d at 224 (internal quotation marks

omitted)). "Such vigilance does not make [plaintiff] a "watchdog" for potential plan errors and

abuses." *Id.* at 523. In short, since *Miller*, the Third Circuit has required only that putative

participants and beneficiaries "exercise reasonable diligence" in investigating and preserving

their ERISA benefits. *Id.* at 522.

In reviewing Count I therefore, it is plain that Plaintiff in this case failed to exercise

reasonable diligence in the face of the Pension Plan's clear repudiation of her rights. Firstly, Mr.

Mercadante, the fund administrator, informed her annually that she was not a Plan participant,

and continued to so inform her after he also became a fiduciary of the Pension Plan. Secondly,

Plaintiff testified that she knew from at least 1998 onward that no contributions to the Pension

Plan were being made on her behalf.[13]  Lastly, it is undisputed that while Plaintiff received

---

[13] In support of its theory that the absence of a notification from the Pension Plan could constitute
a repudiation by the Pension Plan, Defendants rely heavily on another case from this District,
*Sturgis v. Mattel, Inc.* 525 F. Supp. 2d 695 (D.N.J. 2007). In *Sturgis* the court found that the
particular ERISA plan in question required regular employee premium contributions to continue
enrollment and that the plaintiff had regularly received pay stubs in which no deductions had
been made for employee benefit contributions. The court ruled that receipt of the pay stubs
triggered the plaintiff's reasonable duty to investigate the status of his benefits and began the
limitations period for his ERISA claims. The facts here are even more overt than *Sturgis*, in that

annual contribution statements from the two union benefit funds in which she was enrolled, she never received contribution statements from the Pension Fund.[14]

The same evidence also compels a finding under Count II, that Plaintiff had actual knowledge of her cause of action from at least the date of the clear repudiation in 2007. *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996) ("all the material elements of a breach of fiduciary duty claim were patently obvious" where defendant "openly announced that certain employees would receive better benefits, and others would not. For those who did not qualify, the 'harmful consequences' of the change were obvious. . . . No 'opinions of experts' were needed. Legal consultation was not required.  The plaintiffs had 'knowledge of all relevant facts at least sufficient to give [them] knowledge that a fiduciary duty ha[d] been breached or ERISA provision violated.'" quoting *Gluck*, 960 F.2d at 1177). Plaintiff had actual knowledge of the alleged breaches — failure to collect contributions from the Health Fund and failure to acknowledge participant status — by the date of the 2007 repudiation. Indeed, to find that Plaintiff's claim had not yet accrued in the face of such evidence would do violence to the notions of reasonable diligence and actual knowledge as established by the Third Circuit.

Lastly, the Court finds that in view of the date of Plaintiff's actual knowledge, equitable tolling of the statute of limitations period is not appropriate in this case. Although the parties have focused on out of circuit precedents, the Third Circuit has thoroughly explored questions of equitable relief under ERISA in the related estoppel context.  "A beneficiary [or participant] may

---

the Plan administrator repeatedly informed plaintiff of the Plan's participation determination *and* Plaintiff failed to receive contribution notifications from the Plan.

[14] The undisputed facts are that Plaintiff received annual notifications from her employer, the Health Fund, of contributions on her behalf to the Annuity Fund and the International Fund starting sometime around her second annual review in 1999, but that she did never received such statements from the Pension Plan.

obtain ... appropriate equitable relief ... to redress [ERISA] violations or ... to enforce any provisions of [ERISA]. 29 U.S.C. § 1132(a)(3). A beneficiary can make out a claim for 'appropriate equitable relief,' based on a theory of equitable estoppel. To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 300 (3d Cir. 2008) (citations omitted). A plaintiff, however, must "do more than merely make out the 'ordinary elements' of equitable estoppel to establish a claim for equitable estoppel under ERISA. . . . Because of these heightened requirements, [the Third Circuit] ha[s] consistently rejected estoppel claims based on simple ERISA reporting errors or disclosure violations." *Kurz*, 96 F.3d at 1553 (quoting *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1142 (3d Cir.1993), *cert. denied,* 511 U.S. 1031 (1994)).

In a recent unreported opinion, the court specifically applied these standards to the tolling of the statute of limitations. "[Plaintiff] has not shown that extraordinary circumstances exist here," where "if [plaintiff] had exercised reasonable diligence [plaintiff] would have discovered [plaintiff's] cause of action" by a date outside the statute of limitations. *Dix*, 540 F. App'x at 136. *See also id*. ("Equitable tolling suspends the running of the limitations period if the plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to his claim." (citation, internal quotation marks, and alteration omitted) (quoting *Ortega Candelaria v. Orthobiologics LLC,* 661 F.3d 675, 679–80 (1st Cir. 2011)); *id.* ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances.") (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund,* 393 F.3d 318, 322 (2d Cir. 2004)); *Christian*, 582 F. App'x at 105 ("Under such circumstances, where there was an outright repudiation . . ., it was

reasonable to expect that the statute of limitations would begin to run at that point. Accordingly, [plaintiff's] claim was time-barred when she filed her complaint.").[15] This Court agrees with the reasoning of *Dix* and finds that there is nothing in the record reflecting any extraordinary circumstances that prevented Plaintiff from discovering the facts comprising her claim, that, to the contrary, during the entire period of her employment after 1998, Plaintiff was well aware that neither the Health Fund nor the Pension Plan considered her a participant in the Pension Plan, and that the barest degree of diligence would have alerted her to her cause of action in a timely manner to comply with the statute of limitations to pursue a claim against the Pension Plan, and would have prompted her to submit a request that the Plan compel her employer, the Health Fund, to make contributions on her behalf. She took no action. Equitable tolling of the limitations period is completely unmerited.

## IV. CONCLUSION

Accordingly, because the six-year statute of limitations applicable to both Counts of the Complaint began to run on December 31, 2007, at the latest, and Plaintiff did not file her Complaint until March 23, 2015, Plaintiff's ERISA claims are time barred and must be dismissed

---

[15] The Court also observes that even were equitable tolling warranted, it would not avail plaintiff in the case of a clear repudiation. *Kurz*, 96 F.3d at 1552 (applying federal common law to hold that for equitable relief under ERISA "the limitations period will run six years after the date of the claim's discovery."); *Bohus v. Beloff*, 950 F.2d 919, 925–26 (3d Cir. 1991) (discussing comparable Pennsylvania law to observe that when equitable tolling is established "the statute of limitations is tolled until the plaintiff knew or using reasonable diligence should have known of the claim."). *See also Todish v. CIGNA Corp.*, 206 F.3d 303, 308 (3d Cir. 2000) ("As articulated by the New Jersey courts, the statute of limitations serves several goals, including the security and stability of human affairs created by eventual repose ... [and] the prospective defendants' ability to respond to allegations made against them. These goals are best served in this instance by adherence to the six-year limitations period." (citations omitted)).

with prejudice. Therefore, Defendants' motion for summary judgment on the basis of the statute of limitations is granted.

Dated: _____9/30/2016_____                    _____/s/ Freda L. Wolfson_____
                                               The Honorable Freda L. Wolfson
                                               United States District Judge